CASE NO. 07-CV-2725 (SJF)(LR)
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

---

JENNIFER SAUNDERS, PLAINTIFF

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION, *et al.,*

DEFENDANTS

---

---

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
MEMORANDUM OF LAW**

---

---

JOY HOCHSTADT, P.C.
*Attorney for Plaintiff, JENNIFER SAUNDERS*
300 Central Park West, Suite 2E
New York, New York 10024
Tel (212) 580-9930; Fax (212) 580 9322

## PRELIMINARY STATEMENT

Plaintiff has suffered statutory and Constitutional violations based on the policies, practices and intentional willful conduct of the Department of Education and the individual conduct of its employees.  While Defense has claimed numerous jurisdictional and time-limitation obstacles to Plaintiff prevailing, the defense appeared to be posturing as they already had the documents to refute such objections.

To achieve a Summary Judgment or Partial Summary Judgment. Plaintiff is required to demonstrate that Defendants have broken the laws of which plaintiff complains, that she is protected by said laws and that these violations have been intentional and have injured the plaintiff and that there are no jurisdictional or time-barred affirmative defenses to her claims.  She must do this with materials Defendants have provided, with disclosures and decisions in related cases where the same defendants are parties, with Defendants' and State Education Department websites, the Collective Bargaining Agreement between the DOE-UFT, statutory materials and with affidavits from plaintiff, non-party witnesses and two from Defendants and Former Defendants submitted in defense of their policies in other similarly situated plaintiff's cases.   .

There is sufficient indisputable evidence from these sources to determine as a Matter of Law, how extensively Saunders constitutional, statutory and contractual rights have been violated. We expect there to still be a trial when scheduled for witnesses to provide evidence on the aggravating circumstances and extent of wilful misconduct carried out specifically with malintent to carry out the unlawful policies of the Chancellor and to inflict maximum suffering to Saunders and others similarly situated.

## <u>TABLE OF CONTENTS</u>

<u>PRELIMINARY STATEMENT</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

<u>TABLE OF CONTENTS</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

<u>TABLE OF AUTHORITIES</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

<u>FACTUAL STATEMENT</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       <u>a.  Facts about the Plaintiff</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       <u>b.  Facts about HSGCA and Principal Resnick:</u>. . . . . . . . . . . . . . . . . . . . . . . 2

       <u>c.  Saunders at the Reassignment Center:</u>. . . . . . . . . . . . . . . . . . . . . . . . . 3

       <u>d.  Saunders 3020-a Proceeding</u>:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>ARGUMENT</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>POINT I</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**THERE ARE ISSUES OF LAW AND UNDISPUTED FACT WITH RESPECT <u>TO PLAINTIFF'S CLAIMS TO BE RESOLVED BY JUDGMENT AS A MATTER OF LAW</u>**7

**a. <u>Standards for Granting of Summary Judgment</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**b. Saunders Burden and Allocation of Proof to Sustain a Claim for Retaliation <u>Discharge under Title VII as Alleged in the Second Claim.</u>** . . . . . . . . . . . . . . . . . . . . . . . 7

**c. <u>Saunders Meets the Burden of Proof to Establish a Retaliation Discharge under Title VII</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**d. Defendant's Reason to Terminate Saunders was a Pretext to Cover up for the Discriminatory and Retaliation <u>Discharge</u> after her Complaint of Racism, Agism, <u>Sexism and Hostile Work Environment to NYS Div. Human Rights and EEOC.</u>.** . 10

<u>POINT II</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**ISSUES OF LAW & UNDISPUTED FACT WITH RESPECT TO SAUNDERS <u>COMPLAINT TO DHR/EEOC ON THE BASIS OF AGE IN VIOLATION OF ADEA</u>**. . . . . . . . . . . . . 12

**POINT III**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**SAUNDERS HAS ESTABLISHED DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 AS AMENDED 42 USC §2000-e AND 42 USC §1983**. . . . . . . . . . 15

**a. Race discrimination:**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**b. Retaliation as a Claim Under Title VII**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**c.  Hostile Work Environment Under Title VII**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**POINT IV**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**SAUNDERS XIV A.. RIGHTS HAVE BEEN VIOLATED UNDER 42 USC § 1983**. . . . . 19

**a. Conduct of the Proceedings**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**b. NYSED Standards for Determinations under 3020-*a***. . . . . . . . . . . . . . . . . . . . . . . . . . 22

**c.  Bias Corruption, and Further Evidence of Lack of Due Process**. . . . . . . . . . . . . . . . . . 22

**POINT V**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**SAUNDERS DETERMINATION FROM THE DHR IS NOT PRECLUSIVE TO HER CLAIMS UNDER NY E.L. § 296** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

**Court Cases**

Brown v. Louisiana Lottery Corp.,   240 F.Supp. 590, 593. (DNY 1965) . . . . . . . . . . . . . . . . . . 8

Burlington Industries v. Ellerth, 524 U.S. 742 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Chambers v. TRM 43 F.3d 29, 37 (2d Cir 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . 7

Cruz v. Coach Stores Inc., 202 F.3d 560, 570 (2d Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . 17

Davis v. State University of N.Y., 802 F.2d 638 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . 8, 10

Dey v. Colt Constr. & Devel. Co., 28 F.3d 1446, 1457-58 (7th Cir. 1994). . . . . . . . . . . . . . . . . . 8

Dister v. Continental Group, Inc., 859 F.2d 1108, 1114-1115 (2d Cir. 1989).. . . . . . . . . . . . . . 7

Farragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) . . . . . . . . . . . . . . . . . . . . . . 16, 17

Fisher v. Vassar Coll 114 F.3d, 1332, 1336 (2nd Cir. 1997) (en  banc) . . . . . . . . . . . . . . . . . . . . 11

Fitzgerald v. Henderson, 251 F. 3d, 345, 357 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Friedline et al v DOE et al, 2009 WL 37828, (S.D.N.Y., 2009) . . . . . . . . . . . . . . . . . . . . . 12, 14

Gallo v. Prudential Residential Services Limited Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

Grief Bros Cooperage Corp. v. Unit'd Mine Workers Amer., 42 LA 555 (Daugherty 1964). . 6, 21

Harris v. Forklift Systems, 510 U.S.17, 21-22 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Holtz v.  Rockefeller & Co. Inc. 258 F.3d 62, 78, 79 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 11

Hrisinko v. New York City Dept. of Educ., 2010 WL 826879 (2d Cir. 2010);. . . . . . . . . . . 12, 14

Jalil v. Avdel Corp., 873 F.2d 701, 108 (3rd Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

James v. N.Y. Racing Assn., 233 F3d 149, 154 (2d Cir 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 734-36 (2d Cir.2001). . . . . . . . . 22

Manoharan v. Columbia Univ. Coll, 842 F.2d,590, 593 (2d Cir 1988).. . . . . . . . . . . . . . . . . . . . 8

McDonnell v. Cisneros, 84 F.3d 256, 262 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Meritor Saving Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Patrolmen's Benevolent Ass'n of NYC v. City of New York, 310 F3d, 43, 51 (2d Cir. 2002). . 17

Payne v McLemore's Wholesale and Retail Stores, 654 F.2d 1130, 1140-1141 (5th Cir 1981). . . 8

Preda v. Nissho Iwai America Corp., 128 F3d 789, 791 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . 17

Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . 7

Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir 1996)). . . . . . . . . . . . . . . . . . . . . . . 7

Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Saunders v. DOE Sup. Ct. N.Y. Cty, Index No. 400258/2008). . . . . . . . . . . . . . . . . . . . . . . . .  21

Shapiro et al v. NYC Dep't Ed., 561 F.Supp.2d 413 (S.D.N.Y.,2008). . . . . . . . . . . . . .  12, 14, 15

Schwapp v. Town of Avon 118 F.3d 106, 110 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Texas Dept of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) . . . . . . . . . . . . . . 11

Thomas et al v NYC DOE et al 09-cv-5167 (SLT) (RLM) EDNY filed 2009. . . . . . . . . . . . . . 19

Whidbee v. Garzarelli Food Specialties, 223 F.2d 62, 69 (2d Cir. 2000). . . . . . . . . . . . . . . . . . 16

Wu v. Thomas,  863 F.2d 1543, 1547-48 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**§ 3020-a Cases**

Matter of Florida UFSD v DePace, H.O. Theodore M. Simon, SED Case 2001.[1] . . . . . . . . .  18, 19

**Federal Statutes**

ADEA, Age Discrimination in Employment Act  29 U.S.C. §621 *et seq* . . . . . . . . . . . . . .  12, 14, 15
42 U.S.C.  1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 22
42 U.S.C. 2000e, 42 U.S.C. 2000e-3a, Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

**State Statutes**

Education Law § 2590, §2590 (g-j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 18
Education Law § 3020-a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *im passim*
Education Law § 3813. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Executive Law § 296. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Constitutions**

United States Coustitution Amendent XIV Section 1... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Federal and State Rules**

CPLR Art 75. §7511. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Fed. R. Civ. P. 15 a, b, c. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Fed. R. Civ. P. 56 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
NYCRR 82.1.1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20,

**Books**

Disciplining Teachers and Administrators published by the New York State School Boards
Association ("NYSSBA") Available through *LexisNexis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

---

[1] Citations to rulings by Hearing Officers ("H.O.") presiding over SED cases are cited in Disciplining Tenured Teachers and Administrators, New York School Boards Administration, (Latham, N.Y., 2004) ISBN: 0-8205-8589-0.  (Available on line from LexisNexis).

## FACTUAL STATEMENT[2]

a.  Facts about the Plaintiff::

Jennifer Saunders ("Saunders"), the Plaintiff is a 51 year old African-American woman, who taught under certification for Performing Arts/Radio.  She began teaching for NYC Dept. of Education ("DOE") in 1986 resigned in 1989; resumed October, 2000 and was terminated July 1, 2008 (¶¶1-5).  In September 2002 she transferred from HS Art & Design to HS of Graphic Communication Arts ("GCA"), both school are in midtown Manhattan.  She was tenured at GCA in February 2003 the day the new Principal Jerod Resnick ("Resnick") arrived; he had no input to her tenure, nor to Saunders appointment to be School Coordinator for New York City Mentoring Program on that same February 2003 day (¶12).  However, Saunders was removed as School Coordinator for New York City Mentoring Program in June 2004(¶22), some 17 months later by Resnick.  Saunders was also  reduced to Absent Teacher Reserve ("ATR") status in September 2004(¶26).

In January of 2005 Saunders made a complaint of aggravate harassment/assault to the NYPD against Resnick for having intentionally elbowing her in the corridor of GCA(¶54).  Because there was no action taken either by the police or by Superintendent Taveras(¶60) to whom she also reported the incident, because of the assignment of Saunders photography classes to Nancy Optiz(¶26) a new teacher at GCA as well as the hiring of Liz Torres to teach Saunders video production classes(¶27) and the fact that both  women were white and under 40, Saunders made a complaint to the NYS Division of Human Rights ("DHR")(¶63) which co-filed with the EEOC on her behalf on March 2, 2005.  Saunders was removed from the GCA and sent to a teacher  reassignment center at 333 Seventh Avenue, New York, NY on March 11, 2005(¶74) by the actions of Resnick and Taveras who had received the complaint from DHR and to which they were required to respond.  Saunders as a

---

[2] This **Factual Statement** is modified directly from the Rule 56.1 Statement; it has the same content in the same order. All annotation to documents, affidavits and other support can be found by referring to the Rule 56.1 Statement Accompanying this memorandum, "(¶#)" and "(¶¶##)" identify paragraph's in plaintiff's affidavit; other affidavits are designated by placing the affiant's initials before the"¶".

1

tenured faculty member can only be disciplined pursuant to Education Law §3020-a charges; she was brought up on said charges on or about June 22, 2005(¶90).

Arbitrator Lawson was assigned as assigned as Saunders Arbitrator for the §3020-a hearings on September 5, 2005.  Arbitrator Lawson held the pre-hearing conference on December 19, 2005 Arbitrator Lawson held the first evidentiary hearing on January 19, 2007,  Arbitrator Lawson held evidentiary hearing sessions on  1/19/07, 2/5/07, 2/6/07, 2/27/07, 2/28/07, 3/1/07, 3/2/07, 3/20/07, 3/21/07, 3/22/07, 3/23/07, 4/27/07, 9/21/07(¶92).  Arbitrator Lawson rendered his decision on January 28, 2008 suspending Saunders for 4 months for filing a false police report(¶ ¶ 105,133). Most of the other allegations were dismissed as not proven.  Saunders returned to work on May 29, 2008(¶141).  Saunders time sheets for May and June 2008, show she was present as the TRC almost every day from the 29th of May until the end of the school year on June 26, 2008(¶151).  Saunders was not was not paid at all after February 1, 2008(¶154).  Saunders was not paid for the month of June 2008.  Saunders was not paid 60% of the full summer for accrued vacation for having worked 6 of 10 months of the school year 2007-2008 (Sept., Oct., Nov., Dec., Jan., June).  Saunders request to have her license extended for a year to deal with any administrative issues was denied(¶125).

**b.  Facts about HSGCA and Principal Resnick:**

Resnick arrived as Principal of GCA in February 2003 from his prior position of Assistant Principal ("AP") Security at Grady Vocational H.S. in Brooklyn(¶12).  When Resnick arrived there were about 30 African-American teachers on the GCA faculty.  Currently there are seven African-American teachers remaining.  Resnick has not hired even one African-American teacher since he arrived(¶49).  Resnick removed Saunders from her mentoring position on June 24, 2004(¶22). Resnick appointed Anita Olejnik to be Mentoring Coordinator when school reopened in the fall(¶23).  Olejnik is female, white and under forty.  Resnick removed Saunders from her teaching program in Video Production claiming the program was being eliminated(¶27).  Resnick refilled the position with Liz Torres. Resnick assigned Saunders to be an in-house substitute, or ATR.

Resnick recruited Liz Torres the beginning of the subsequent semester to teach the video program(¶28).  Torres is White and under 40(¶27)..

Resnick was sued for age discrimination. After a jury trial in 2008, three Plaintiffs were awarded money damages(¶144).   Although a mandated reporter, Resnick never reported Olejnik's overt liaison with a senior male student at any time.   Another Assistant Principal reported the situation directly to Special Commissioner for Investigation about two years after Saunders had reported it to Resnick(¶131).  Olejnik was then removed from the school by SCI and reassigned to 333 Seventh Avenue(¶132).

**Saunders at the Reassignment Center:**

Saunders was directed to report to the teacher reassignment center (TRC) on March 11, 2005(¶74) for her next day of work after she was removal from all duties at GCA.  Saunders was to report to the same room everyday that teachers were to report to schools until January 28, 2008 and then again from May28-June 26, 2008(¶151).   The TRC or "rubber room" at 333 is configured on the architect's drawing for 26 persons(¶76).   In June 2006 at the peak of its use 85-95 teachers were assigned to that room(¶124).   The conditions of the "room" were reported to Public Employees Safety/Health agency ("PESH") in early 2006(¶115). PESH issued many violations, as to crowding, air quality, numerous fire violations, inadequate ventilation (no windows, in adequate mechanical air circulation).  The violations were never cured–with the exception, that the single door to the TRC room was rehung to open in the direction of emergency egress.  Respiratory illness afflicted the following teachers and was well-known to the administration: Paul Santucci (hospitalized for acute bronchitis), Gilda Teel (died of Bronchial Pneumonia), Deborah White, Josefina Cruz (required an electronic respirator in the TRC for her COPD), Jennifer Saunders, Diana Hrisinko et al.(¶123)

Chancellor's regulation C-770 requires that reassigned teachers be treated with dignity and be given appropriate administrative assignments commensurate with their license area and position.

3

No work assignments were given(¶109).  Many teachers complained to the administration about the conduct of Donna Dennis and Ester Antinez, two clerical level aides of Judith Rivera, Deputy Director for Human Resources and responsible for the operation of the TRC(¶161).  These two hourly employees without higher education were left "in charge" of the 50-90 professional, tenured, graduate-degree educated and certified school teachers in Rivera's absence (Rivera resides in the Monroe County, PA, an almost 200 mile round trip commute that is infrequently made).

Commencing September 5, 2007 Allied Barton uniformed guards were hired to sit at the entry of the TRC room and monitor entry and egress by requiring the teachers to sign whenever they left or entered, even to the water fountain, rest room, lunchroom area on the same floor.  Teachers were also required to sign a "contract" from the administration in which they agreed to that no work of any kind would be performed, no electronic devices would be brought to the premises *inter alia.* There was continual video surveillance by means of a video camera at the entry to the TRC(¶160)

**Saunders 3020-a Proceeding** :

Saunders charges were brought without being voted on by a School Board.  Saunders Charges were brought on June 22, 2005(¶90).  NYS Education Law  §3020-a mandates the specifications must be voted on by the School Board.  Education Law §2590 of the Education Law as originally written went into effect in 1969.  Section §2590 (j) an amendment to §2590  allowing NYC School Superintendents to authorize charges without any independent board vote was enacted in August 2006 and became effective October 2006.  In all other but the five counties of NYC, no NYS teachers can be brought up on disciplinary charges without the majority vote on each specification  or allegation by the usually elected district school board.

Ed. L. §3020-a mandates that the American Arbitration Association ("AAA") provide a list of 15 highly qualified labor arbitrators to both sides of each case to jointly select a mutually acceptable arbitrator.  Ed. L. §3020-a was amended to read that the UFT-DOE provisions rather than provisions of §3020-a shall apply to NYC teachers effective October 2006.

4

The UFT-DOE contract for October 2005-2008 was executed retroactively in mid-Nov. 2006.   The UFT-DOE contract has a continuing clause in the event of expiration without a new contract.   The first UFT-DOE contract that provides for the "rotational panel" of arbitrators is the 2005-2008 contract.   The arbitrator lists must be sent within 15 days of the teacher's request for a hearing per §3020-a(¶91).   No such list was ever sent to Saunders; an executive committee of the UFT and DOE made an agreement for a "rotational panel" and implemented it, in 2000 without either legal authority from the legislature, nor vote from the membership ratifying a contract(¶128).

Ed. L. §3020-a mandates that the arbitrator must conduct a prehearing within 15 days of accepting the case.   The Arbitrator **assigned** to hear to Saunders case accepted the case on September 5, 2005.   Arbitrator Lawson, the appointed arbitrator held the prehearing on December 19, 2005; 115 days after appointment and 100 days later than the statute permits.   Ed. L.  §3020-a requires that the arbitrator to begin the evidentiary hearings within 15 days of the pre-hearing. Arbitrator Lawson held the first evidentiary hearing on January 19, 2007; 397 days later; he was mandated to hold the hearings no more than 15 days after the pre-hearing and a maximum of 30 days after his appointment/acceptance of the case.   Instead he held them 382 days later than the statute allows for the pre-hearing reference point and 481 days late from the time of his appointment. Arbitrator Lawson held hearings on 1/19/07, 2/5/07, 2/6/07, 2/27/07, 2/28/07, 3/1/07, 3/2/07, 3/20/07, 3/21/07, 3/22/07, 3/23/07, 4/27/07, 9/21/07(¶92). Ed L. §3020-a requires that the hearings be completed within 60 days and that they are to be held on consecutive days until completed (5 days over 2 business weeks is accepted as consecutive).   The hearings took more than eight months to complete, when 60 days are the maximum.   The hearings were not held on consecutive days (even with the allowance that 5 hearing days in 2 work-weeks were acceptable "as consecutive days").   There were intervals of three weeks where there were no hearings.   There were no hearings between 2/6/07 and 2/27/07.   There were no hearings from 3/2/07 until 3/20/07, There

were no hearings from 3/23/07 until 4/27/07 and from 4/27/07 until 9/21/07.  Those dates do not comply with the consecutive days statutory provision.

Ed L. §3020-a requires that the decision be rendered no longer than 30 days after the hearings end.  The decision was rendered on January 28, 2008 more than 4 months instead of one and over 3 months late.

The entire process is mandated to be completed in 135 days from the charges being recommended, this process took from March 11, 2005 until January 28, 2008; 1058 days or 1023 days longer than it should have or 2.9 years.  It took almost 8 times as long as it is legally permissible.

Transcripts of the hearings indicate the arbitrator interrupted cross examination of Resnick(¶95).  The transcripts further indicate the Saunders NYSUT counsel reiterated that the standard for the statutory requirement that "just cause" be demonstrated, adopted by the NYS Association of School Districts requires the use of the seven-prong test after Grief Brothers Cooperage v. United Mine Workers of America, 42 LA 555 (Daugherty 1964).  No where in the decision where the Arbitrator explains his reasoning does the arbitrator show evidence that he used more than the first prong (the preponderance of the evidence).  The other prongs including whether other teachers found to have exhibited equivalent conduct, received the same penalty, whether the conduct was disruptive to the operation of the school, whether there was prior warning that the conduct would be unacceptable, whether there was any attempt at remediation, did the penalty match the transgression, and was the penalty appropriate in a scheme of progressive punishment do not appear to have been considered in formulating the arbitral award.

## ARGUMENT

## POINT I

**THERE ARE ISSUES OF LAW AND UNDISPUTED FACT WITH RESPECT <u>TO PLAINTIFF'S CLAIMS TO BE RESOLVED BY JUDGMENT AS A MATTER OF LAW</u>**

**a.  Standards for Granting of Summary Judgment**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrants judgment for the moving party as a matter of law.  See, Fed. R. Civ. P. 56(c);see generally <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. <u>Schwapp v. Town of Avon</u> 118 F.3d 106, 110 (2d Cir. 1997).

**b.       Saunders Burden and Allocation of Proof to Sustain a Claim for Retaliation <u>Discharge under Title VII as Alleged in the Second Claim.</u>**

The plaintiff must demonstrate: (1) that she participated in a protected activity known to the defendants, (2) that she was subject to an adverse employment action, and (3) that there is a  causal connection between the protected activity and the adverse employment action.  <u>Reed v. A.W. Lawrence & Co.,</u> 95 F.3d 1170, 1178 (2d Cir. 1996).  Protected activity pursuant to 42 U.S.C. 2000e-3a has further been liberally interpreted to include such situations as "was suspected of making a charge," having allowed a charge to be made in his behalf, <u>Wu v. Thomas,</u>  863 F.2d 1543, 1547-48 (11th Cir. 1989) and complaining of false accusations of sexual harassment and other sexual misconduct, which are all construed to fall under opposition conduct, and can be a form of discrimination, <u>see,</u> <u>McDonnell v. Cisneros,</u> 84 F.3d 256, 262 (7th Cir. 1996).

Retaliatory discharge in violation of Title VII, 42 U.S.C. 2000e-3a occurs whenever a "retaliatory motive plays a part in [the discharge], . . . whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." <u>Cosgrove v. Sears, Roebuck & Co.,</u> 9 F.3d 1033, 1039 (2d Cir. 1993) as quoted

7

in Reed, 95 F.3rd at 1177-1178.  This Circuit has also commented on terminations in employment discriminations, and the difficulty in obtaining direct evidence and the lack of a smoking gun in a number of cases.  See Chambers, 43 F.3d at 37; Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir. 1991); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir. 1989); Dister v. Continental Group, Inc., 859 F.2d 1108, 1114-1115 (2d Cir. 1989)."The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion 'at the prima facie stage is de minimus.' " Dister 859 F.2d at 1114 as quoted in Chambers, 43 F.3d at 37.

A plaintiff can establish a prima facie case of retaliatory discharge, if she shows that she had a reasonable belief that the alleged conduct constituted an unlawful employment practice; it does not matter whether the conduct was, in fact, such a violation.  Payne v McLemore's Wholesale and Retail Stores, 654 F.2d 1130, 1140-1141 (5th Cir 1981).

c. **Saunders Meets the Burden of Proof to Establish a Retaliation Discharge under Title VII.**

1.  Saunders participated in protected activities known to defendants.

When Saunders complained to NYS Division of Human Rights, on March 2, 2005, and on March 16, 2005, she was engaged in a protected activity by standards applied to Title VII, *see* McDonnell v. Cisneros, 84 F.3d at 258, (7th Cir. 1996) she gained the same protective rights that formal complaints to the EEOC receive.   In fact, it 'is improper to retaliate for the filing of a claim in violation of Title VII, even if the claim does not have merit, provided it is not completely groundless." See, Dey v. Colt Constr. & Devel. Co., 28 F.3d 1446, 1457-58 (7th Cir. 1994). Saunders need not establish that the conduct was a violation of Title VII.  Manoharan v. Columbia Univ. Coll, 842 F.2d,590, 593 (2d Cir 1988) citing Davis v SUNY, 802 F.2d. 642 (2d Cir 1986). Compliance with this latter standard makes relief to retaliation much more enforceable than the underlying discrimination.  Saunders complained to the NYSDHR and co-filed with the EEOC concerned being discriminated against(¶63).  However, it should be noted that a "typical employee is not schooled in the minutiae of employment discrimination law; it would chill employee whistle-

8

blowers to require that their objections be to practices that actually are covered by Title VII."
Brown v. Louisiana Lottery Corp.,   240 F.Supp. 590, 593.  Also see, Payne at 654 F.2d at 1140.
 Immediately thereafter, (about a week later), Saunders was removed from the school and sent to
the "Rubber Room"(¶74) where teachers are send to be brought up on formal charges to be
"disciplined." which means fired if the employer can convince an arbitrator to terminate the
employee.  In this complaint DHR, Saunders was  engaged in  protected activities.

     2.     There was an adverse employment action.

Immediately upon receipt of Saunders complaint, DHR relayed the complaint to DOE and
on March 11, 2005 Saunders was removed from her position at GCA to begin officially her road
to be terminated from her employment with DOE.  Defendants concede that being removed from
the school, being brought on disciplinary charges was an adverse employment action.

     3.     There is a causal connection between the protected activity and the subsequent
                 adverse employment action, the removal of Saunders for having gone to DHR.

The timing between Saunders report to the DHR, the DHR acknowledgment that they sent
the complaint to the employer immediately and thus animus that presumptive racial discrimination
would be exposed through an investigation revealing rapid attrition and removal; of 80% of the
African American teachers from GCA and not a single African American that was hired by Resnick.

Plaintiff filed her second complaint, this time tor retaliation on March 16, 2005(¶74), after
reporting to the reassignment center for two days and seeing how very pejorative it was and that the
most adverse employment action was the reassignment center.  The decision to discharge made at
this time.  In order to fire a tenured teacher, she must be brought up on disciplinary charges pursuant
to Ed. Law § 3020-a.  The DOE lawyers and the Special Commissioner of Investigation for the
DOE must first develop the charges and investigate them, respectively.  DOE's goal then was to be
able to serve them on the respondent teacher in six months.  About half the time, the charges were
delivered in six months.  And then most often they were delivered within one to two weeks of the
six month mark.  In Saunders case, they were served in half that time, on or about June 22,

2005(¶90), demonstrating that her school began to prepare them as soon as she was removed to the TRC.  Though the removal from the school is tantamount to the intent to terminate, the explicit declaration that termination was what the DOE sought was stated in the charges.  The time frame of the complaint and the decision to terminate is a compelling consideration.  In the case at bar, there were only seven business days from the March 2, 2005 complaint to DHR, to the decision to discharge  Saunders and her removal from her workplace to where she would be warehoused and harassed for the next 35 months(¶105) in hopes she would resign from the hostile work environment deliberately created to induce her to resign earlier or if the Arbitrator would order other than termination.

There are two methods of establishing a causal connection between a protected activity and an adverse employment action.  Directly through evidence of retaliatory animus. The direct evidence of discriminatory and retaliatory animus which are demonstrated in the events that took place between June 2004 and March 2, 2005 and indirectly by showing that the protected activity was closely followed in time by the adverse action(¶34).  Davis v. State University of N.Y., 802 F.2d 638 (2d Cir. 1986); Jalil v. Avdel Corp., 873 F.2d 701, 108 (3rd Cir. 1989).  Thus, Saunders has established both methods.

**d.      Defendant's Reason to Terminate Saunders was a Pretext to Cover up for the Discriminatory and Retaliation Discharge after her Complaint of Racism, Agism, Sexism and Hostile Work Environment to NYS Div. Human Rights and EEOC.**

The saying, timing is everything in life, is not a legal doctrine. However in the case at bar, this saying unravels defendant's claim that the discharge was non-discriminatory and justified.   In order to coverup the retaliatory intent to terminate Saunders, DOE Legal Services needed to create a non-discriminatory reason for the termination since Saunders technical skills at the subjects she taught before denigrating her to the position of ATR and past achievements including 25 years experience teaching film and related performing arts were considerable. After receiving the mandated report from Saunders(¶18) that threatened Resnick's ability to maintain Olejnik in the

school with him, it was one adverse employment action after another, but Saunders was a tenured teacher so the creation of a hostile work environment at the school that went from the devastating (removing her from her beloved teaching schedule in photography(¶26) and video production(¶28) and the students whom she trained in those classes semester after semester in ongoing projects) to the ridiculous, insulting and humiliating (peeking around the corner of the corridor to espy any onlookers and then painfully elbowing Saunders in the ribs)(¶¶35,49).  But none of this ever lead to an unsatisfactory rating because she was an outstanding teacher.  The only unsatisfactory rating she received was after she received her "charges" in order to justify seeking her termination.

However by the beginning of March 2005(¶34), the atmosphere was so hostile, her treatment by Resnick and even Tavaras (Resnick's boss, Superintendent of the District) had become sufficiently painful(¶57) that she complained to DHR, which in turn cross file with EEOC.  The retaliation discharge initiated by removal from the school then moved with incredible speed as per the number of "walk-throughs" to observe and note such inane thing as a student wearing a hat or a newspaper on the desk in the days immediately after DOE would have received the DHR complaint and one week later when Saunders was removed to the TRC.

Though the actual decision to remove to the "rubber room" and terminate Saunders was retaliatory and her removal came only seven workdays after her complaint to the DHR(¶64) of discrimination on the basis of age, race and sex, up until she complained to DHR the actions had been hostile, racist, ageist and sexist but she never felt her tenured position was threatened re termination until she made a formal complaint for the harassment and discrimination DHR(¶63).

In <u>Fisher v. Vassar Coll</u> 114 F.3d, 1332, 1336 (2nd Cir. 1997) (en banc) the court held,

> the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited fact or was at least one of the motivating factors".

Saunders has met the balancing tests and the burden of proof according to <u>McDonnell Douglas v. Green,</u> 411 U.S. 792, 802 (1973), and <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507

11

(1993), Texas Dept of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) James v. N.Y. Racing Assn., 233 F3d 149, 154 (2d Cir 2000). The validity of the defense of nondiscriminatory justification is ordinarily for the jury to decide.  Holtz v.  Rockefeller & Co. Inc. 258 F3d,62, 78, 79 (2d Cir. 2001).   But in this case there is such compelling evidence of the underlying discrimination (see below) that when coupled with the nexus between the complaint to both State and Federal employment rights agencies and when she was removed from the workplace altogether, that the standards in this Circuit that retaliation played at least a part in her removal entirely from the workplace is established as a matter of law, since based upon all of the foregoing, a reasonable juror could not fail to find that a retaliatory motive played some role in Saunders removal from the school only after she reported the severe discrimination based on race and age that she had been suffering for the eight to nine months prior to her removal, and ever since she complied with the mandated speech that was required of her when child abuse or molestation is suspected by any teacher, school administrator, social worker, physician, nurse or psychologist *inter alia.*  Though Resnick was already demonstrating his age discrimination *see*  Hrisinko v. New York City Dept. of Educ., 2010 WL 826879 (2d Cir. 2010); Friedline *et al* v DOE *et al*, 2009 WL 37828, (S.D.N.Y., 2009)

## **POINT II**

### **ISSUES OF LAW & UNDISPUTED FACT WITH RESPECT TO SAUNDERS COMPLAINT TO DHR/EEOC ON THE BASIS OF AGE IN VIOLATION OF ADEA**

In March of 2005 Saunders was removed from GCA to a TRC where teachers are warehoused and not allowed to teach(¶74).  In June 2005, Saunders and fifteen other "teachers at GCA were given unsatisfactory ratings ("U ratings") for the year.  Of the 16, thirteen were over the age of 40.  A year later, in June 2006, eight teachers received U ratings, only one of whom was under age forty." Shapiro *et al* v. NYC Dep't Ed., 561 F.Supp.2d 413 (S.D.N.Y.,2008).  Also, Resnick selected five teachers who were involuntarily, transferred from GCA and reassigned to another school. All were over age forty.  *Id.*  Between 2005-2007 Resnick sent seven teachers to

12

the reassignment center of rubber room to await disciplinary charges that sought their termination; all but one were older teachers protected by the ADEA.

Resnick also denied teacher Friedline a number opportunities at GCA that she felt were quite reasonable for her to be granted.  When Friedline complained to Resnick that these actions were prompted by age discrimination, he told her that he preferred to hire younger candidates.   In June 2005, Friedline was given her first U rating in her 15 year tenure at the school(¶49). *Id.* at 417. Resnick exhibited "extreme dismay" when he learned that teacher Anthony Ferraro had changed his mind and would not be retiring.  Thereafter, Ferraro, was frequently chided that he ought to retire and given a variety of reasons why he might enjoy life more as a retired person. *Id* at 418. Ferraro was also removed from two positions which he held in the school and replaced with much younger teachers at least one of whom was not properly licensed for the position. *Id*   Ferraro then received at "U" rating. *Id.*   At least 19 teachers over 40 were subjected to discriminatory treatment.(DF ¶26).

On three specific occasions Saunders suffered adverse employment actions between June of 2004 and February of 2005.  In the first Saunders was removed from a prestigious and lucrative after school program the city-wide Mentoring Program(¶22) which Saunders had successful administered for 18 months, on the pretext the she was behind in submitting the reports that comprised the administrative component of the role.  This occurred in June 2004(¶23) and that program was given to Anita Olejnik who was white and under 40.  The second adverse employment action to Saunders was that in September 2004 all of Saunders classes in the performing arts for which she was licensed and tenured were taken from her and she was made into an "Absent Teacher Reserve,"(¶26) her photography class was immediately given to a new hire Nancy Optiz, who was white and under 40.  Her video production class was not offered that semester on the pretext that there was insufficient enrollment.  This was untrue because the group of students who comprised the class had enrolled for four consecutive semesters to produce a video on their own with Saunders

which was in the midst of its post-production work, and for which all students planned to enroll for a fifth semester(¶32;DO ¶13;FM ¶6;MC;¶¶25-29) . Resnick re-offered the class, the immediately the following semester, only a few months later, assigning, Liz Torres(¶28), who was under 40 and white to teach it, and who moreover did not have the requisite performing arts license.  Apparently Torres did not feel confident to teach the class as she, therefore recruited to her new video  class as many of Saunders former students as possible so that they could mentor the new students without video production experience(MC¶¶30-32).  Danny Ochoa (DS), Mark Chapman (MC), and Fernando Madera (FD), attest to what it was like to be taught by Saunders and then to lose her and be taught by Torres.  Saunders arranged to have her students complete the post-production phases at the Manhattan Neighborhood Network (MNN) facilities and she worked with the students there after school to complete the video (¶77;*see* DVD Exhibit).  When Resnick heard about this a few weeks later, he called the MNN to inform them that Saunders was fired (which she was not), that it was illegal for her to be meeting with students, there and he demanded the tape that was being produced(¶78). Saunders was already well-established there her students and she worked well toward their objective of producing a high quality student video (Exhibit 7) and MNN ignored Resnick's words which they found to be not credible(¶¶80-81).

In addition,  "[t]hree white younger teachers were hired [at GCA] to replace" Ms. Chavez and her colleagues(¶144) *see* Friedline *et al* v. NYC Dep't Ed *et al*., WL 37828 (S.D.N.Y. 2009), the plaintiffs in that action also alleged proof that defendant Resnick made "disrespectful remarks" that made Ms. Chavez feel that she was aging, *id.*  and "evidence of the language used by Defendants and directed at [Ms. Cruz to the same effect]."  Ferraro, Friedline, and Maroni , are yet three other GCA teachers won jury verdicts in their age discrimination claim against Resnick and his practices.[3] Finally, the dismissal of Hrisinko's at summary judgment was reversed by the Second

---

[3]  Twelve GCA teachers (other than Saunders) brought claims of age discrimination, retaliation and violation of equal protection and due process rights under 42 USC 1983 against the DOE and Resnick, *see* Shapiro v. New York City Dept.

Circuit.  *See*  Hrisinko v NYC Dep't of Educ., 2010 WL 826879 (2d Cir. 2010);  Shapiro *et al* v. NYC Dep't Ed., 561 F.Supp.2d 413 (S.D.N.Y.,2008).  Hrisinko was one of the teachers involuntarily removed from the school by Resnick.  *Id.* at 418.  Elaine Jackson raised the Regents Exam passing ratio for the school, Resnick, never criticized her work yet he fired her and replaced her with someone younger who had none of the requisite experience.  Midge Maroni was the advisor to the GCA newspaper and was replaced in that extra pay job by a much younger teacher. Six other teachers at GCA all complained of Resnick's harassment, adverse employment actions, hostile work environment and retaliation derived from age discrimination in violation of the ADEA(DF ¶27).  Several of their claims were dismissed because they had become time-barred or they failed to exhaust administrative remedies, and **not** because they failed to prove that the conduct took place or that was in violation of the ADEA.  How many documented cases of Resnick removing teachers protected by the ADEA from their positions, making harassing statements or gestures, forcing them from the school by forced retirement, transfer or pretextual disciplinary charges(¶144), before Saunders allegation is established by collateral estoppel?

### POINT III

### SAUNDERS HAS ESTABLISHED DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 AS AMENDED 42 USC §2000-e AND 42 USC §1983

### a. Race discrimination

All the above adverse employment actions that apply to age discrimination equally apply to race.  Three of the teachers who suffered the age discrimination in the cases above as well as Saunders were African-American or in one case had very dark skin but owed her heritage to Latin America.  Thus, it is difficult to know whether racial animus or age discrimination were the predominant motivation, or both equally.  Judge Rakoff who presided over the age discrimination cases opined that when an employer is guilty of one type of discrimination there has been a

---

of Educ., 561 F.Supp.2d 413, 419-20, 422 n. 2 (S .D.N.Y.2008).

likelihood, in his experience, that the same employer will be found to haved engaged in other types of discrimination as well.  *Cf.* Shapiro *et al* v NYC DOE *et al*, F.Supp.2d 413 (S.D.N.Y.,2008)

In Saunders case there is direct evidence that Resnick was particular harsh on Saunders for any expression of Black pride, or teaching of Black history.  During Black History month Saunders opened one class with singing the "Eyes on the Prize."(¶38)  The Administrator not only walked out of the class which he had come to observe, but a letter-to-file became one of Saunders §3020-a charges for singing a song in an economics class and was one of the stated reasons he had her removed from the building and sent to the "rubber room."

In addition, there is the statistical evidence that of the 30 or more African-American Teachers that were in place at GCA when Resnick arrived, only seven remain today.  The African-American teachers were transferred (voluntarily to escape the hostile work environment or involuntarily by transfer to another school), harassed to resign or retire, or were sent to the "rubber room."   Of the seven teachers that were sent to the "rubber room" to await disciplinary charges on pretexts that they had done something incompetent or wrongful, six were African-American or dark-skinned Hispanics.  Resnick has not hired one African-American teacher since he arrived at GCA.

**b. Retaliation as a Claim Under Title VII**

As already discussed in Point I sections b. c. and d there is considerable evidence that retaliation was a strong motive in the adverse actions and discrimination that occurred.

**c.  Hostile Work Environment Under Title VII**

In order to prevail under the theory of hostile work environment Saunders needs to establish that she was subjected to a hostile environment that was sufficiently severe or pervasive so as to alter the conditions of her working environment and create an abusive working environment.  See, Meritor Saving Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  Also, Saunders must show a specific

basis for imputing liability for the hostile work environment to the employer. <u>Fitzgerald v. Henderson,</u> 251 F. 3d, 345, 357 (2d Cir. 2001). When considering whether the incidents of a harassment constitute a hostile work environment, the court must consider the totality of the circumstances, <u>Whidbee v. Garzarelli Food Specialties,</u> 223 F.2d 62, 69 (2d Cir. 2000). In <u>Farragher v. City of Boca Raton,</u> 524 U.S. 775, 787-88 (1998) (citing <u>Harris v. Forklift Systems,</u> 510 U.S.17, 21-22 (1993), the United States Supreme Court published a non exclusive list of factors which included the severity of the conduct; whether the conduct was humiliating; whether the conduct unreasonably interferes with an employees work performance. A plaintiff can establish a hostile work environment by showing either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuing and concerted to have altered the conditions of plaintiff's working environment. <u>Cruz v. Coach Stores Inc.,</u> 202 F.3d 560, 570 (2d Cir. 2000).

The hostile work environment which was part of the retaliation against Saunders, both of which are prohibited conduct, is not limited just to a reduction in salary or other employee pecuniary benefits,. *See* <u>Preda v. Nissho Iwai America Corp.,</u> 128 F3d 789, 791 (2d Cir. 1997). It includes a retaliation motivated reduction of duties, and diminution in the complexity and prestige of the work assignments, which is what happened to Saunders. See <u>Patrolmen's Benevolent Ass'n of New York v. City of New York,</u> 310 F3d, 43, 51 (2d Cir. 2002). The undisputed and indisputable facts supporting the claims of retaliation and of a hostile work environment are first the diminution of duties by being relieved of her teaching program and for the entire school to see(SG ¶6;MC ¶26;FM ¶6;DO¶¶12,13,19,29) she was reduced to being a day-to-day "sub," then the reassignment to the "TRC" or rubber room and the horrific and intentionally hostile work conditions or no assigned work, surveillance and draconian rules, and finally the severely docked pay for medically indicated(¶124) schedule changes necessitated by documented and uncorrected employer violation of health and safety codes in crowding, inadequate ventilation, fire code violation at the rubber rooms.

17

An employer is presumed responsible where the individual(s) were the victim's supervisor(s), or successively higher so that the employer may be subject to vicarious liability. Burlington Industries v. Ellerth, 524 U.S. 742 (1992).  Farragher, 524 U.S. at 807.  Rivera as Deputy Director of Human Resources was a decision maker; Antinez and Dennis as Rivera's direct subordinates carried out her directives, all of whom had input into the adverse employment actions including the conditions, rules, and denial of pay of Saunders are the "employer" in this case(¶151;JS ¶¶12-21)[4].  As "employer" they had the power, and authority to determine Saunders' work assignment or lack thereof, salary actually paid on a week to week basis, and the conditions and draconian rules' enforcement in the rubber room.  Resnick on the other hand, prior to sending her to the rubber room, had complete control of Saunders' after-school assignments and extra pay, class assignment to a regular program of video production and photography or day-to day "coverages," annual review, and continued employment in the school vs. reassignment to confinement in the rubber room.  Each of them exercised that authority.  The establishment of and operation of the rubber rooms as an institutional device is directly attributable to the very top decision makers Klein and Bloomberg, who are fully aware and authorize their operation and who are regularly called upon to explain, justify and defend this expensive teacher detention to the public that exists almost nowhere in the state and which derives from the manner in which they have chosen to promulgate "teacher discipline" which is a concerted effort to fire tenured older, hired paid teachers, and long time UFT members. This is integral to a campaign to replace them with young new recruits, at lower pay, and to undermine the UFT(¶161).  The very concept of targeting tenured teachers protected by state law is unlawful, when done under color of law is "profiling" and a violation of XIV amendment rights of property interests in continued employment of those tenured, and has been sufficiently exposed to the public by the media(¶¶160-162) that the facts

---

[4] "JS ¶#" denotes and affidavit prepared by Saunders for the Labor Department seeking unemployment benefits.

sufficiently well-established that Saunders is entitled to judgment as a matter of law on the hostile work environment of the ATR assignment and of assignment to the rubber room for three years.

**POINT IV**

**SAUNDERS XIV RIGHTS HAVE BEEN VIOLATED UNDER 42 USC § 1983**

**a. Conduct of the Proceedings**

Ed. L. § 3020-a calls for the School Board to vote on each specification.  Ed. L. §2590 and specifically §§2590(g)-(j) were not amended until August 13, 2006 to allow the Chancellor to delegate this authority to Superintendents.  These changes do not appear in §3020-a itself but buried in the very lengthy legislation §2590 for the operation of NYC schools under mayoral control. Saunders charges were served on her in June, 2005.  It was illegal for Superintendent Tavaras  to have brought such charges in 2005.  Thus, there was no independent review for frivolous charges to be dismissed before the charges are brought. See Educ. Law 3020-a (4) (c.) ; Matter of Florida UFSD v DePace, H.O. Theodore M. Simon, SED Case 2001.[5]

Educ. Law § 3020-a (3)(b)(iii) 8 NYCRR § 82-1.6 (a) mandates that the employee and the employer agree on the arbitrator.  There was no such agreement.  Saunders was advised that her arbitrator would be Eric Lawson and that there was no choice(¶164). Educ. Law 3020-a(3)(b)(ii); 8 NYCRR§ 82-1.6(b) specifies that within 10 days of the NY State Education Department ("NYSED") receiving notification of the employee's demand for a hearing the NYSED the Commissioner is supposed to request the American Arbitration Association ("AAA") to send a list of labor arbitrators to the parties for agreement on an arbitrator.  This provision was changed by DOE-UFT executive committee agreement and implemented unratified by the UFT membership beginning in 2000.  In the following CBA retroactively contracted back to late 2000 it appears as

---

[5]  Citations to rulings by Hearing Officers ("H.O.") presiding over SED cases are cited in Disciplining Tenured Teachers and Administrators, New York School Boards Administration, (Latham, N.Y., 2004) ISBN: 0-8205-8589-0.  (Available on line from LexisNexis).

a cryptic "better served by a permanent panel" buried in a 205+ page collective bargaining agreement ("CBA"). The §3020-a law provides that the employee has the choice between the provisions of the CBA or the statute as written, and was not changed until August 13, 2006 to read that for NYC, the CBA provisions will be the only ones available to NYC teachers. This restriction in due process is being challenged facially on equal protection grounds, *see* Thomas *et al* v NYC DOE *et al* 09-cv-5167 (SLT) (RLM) EDNY.  Saunders should have been advised she had the choice of assigned arbitrator or she could chose one a from an AAA list (*see* Exhibit 6) because her charges predated change in the law by over a year. This never happened in Saunders case nor in the case of numerous other NYC teachers.

Educ. L. 3020-a § mandates the a pre-hearing conference must be held within 15 days of the H.O. agreeing to preside over the case. In Saunders' case she was notified by her union as to who her arbitrator, prosecutor, and defense counsel would be on or around September 12, 2005. Clearly the H.O. had to have agreed to preside over the case sometime before Saunders' union could notify petitioner who her entire hearing team would be. A pre-hearing conference was held on December 19, 2005, more than three months later. Therefore, while there is a statutory mandate of 15 days, H.O. Lawson took 100 days to hold the pre-hearing conference in violation of 3020-a, a clear violation of the statute, and thus ,of due process(¶94).

The statute requires that the §3020-a hearing begin within 15 days after the pre-hearing. The prehearing, held on December 19, 2005 was not 15 days before the hearing began on January 19, 2007. It was 13 months later that the hearing began, 26 times the statutory limit(¶92).

Educ. Law 3020-a §(3)(c)(vi); 8 NYCRR 82-1.10(f) specifies that the hearing must be completed within 60 days of the prehearing conference. In Saunders' case the pre-hearing conference took place on December 19, 2005 and the final hearing date was September 21, 2007. Educ. Law § 3020-a was clearly violated as 640 days exceeds 60 days by over 11-fold.

The decision is mandated to be rendered within 30 days of the final hearing according to 3020-a statutory provisions.  Educ. Law 3020-a §(4)(a); 8 NYCRR §82-1.10(f).    On September 21, 2007 H.O. Lawson closed the hearings after both sides made their closing arguments.  NYSED received the decision on November 27, 2007.  That is 66 days, not the 30 the statute mandates.

NYSED warns hearing officers that they must order expedited transcripts in order to meet their statutory deadlines.  *See* Disciplining Teachers and Administrators published by the New York State School Boards Association ("NYSSBA").   The letters requesting a specific arbitrator to preside over a particular case also demands they comply with all deadlines as a condition of accepting the assignment.  The CBA mandates that the timeline must be adhered to. (*See* CBA on UFT website uft.org).  The §3020-a statute requires that the time line be adhered to.  The timeline is prominently featured on the nysed.gov website, yet none of these mandates were complied with. Ed. L §3020-a was totally violated.  There is no disagreement in the timeline; it is uniform throughout the state.  At every level there is the mandate to comply with it.  Saunders posits that the entire hearing was held without jurisdiction because it began 18 months after it was mandated to begin.

The post-deprivation procedures, through *de jure* do not meet constitutional standards of equal protection because under CPLR Article 75 there would be a 90 day statue of limitations as for all other arbitrations; only §3020-a has a 10 day statute of limitations.  They also do not meet due process standards because it was virtually impossible for Saunders to analyze the over 30 page decision, compare it to the over 2000 pages of transcripts, research the standards for review and apply them, draft and file the petition in 10 days from receipt of the decision.   In Saunders requesting poor person's status(¶136), she had even less time because the certification of the poor person's status took several days and her petition was dismissed on timeliness alone *cf.*  Saunders v. DOE Sup. Ct. N.Y. County Index No. 400258/2008).  Under these conditions the collateral estoppel of an unreviewed § 3020-a decision, cannot be allowed to apply.

21

**b. NYSED Standards for Determinations under 3020-*a***

The NYSED and the §3020-a statute require "just cause" for discipline.  The NYSSBA apply a seven part test to analysis of just cause according to <u>Grief Brothers Cooperage Corp. V. United Mine Workers of America,</u> 42 LA 555 (Daugherty 1964).  The first criterion is have the allegations been proven.   The second part of the test was did the employing Board warn the employee that the conduct could result in disciplinary action?  The third criterion of the seven part "just cause" test is whether the rule or policy is being enforced reasonably, and related to the orderly, efficient and safe operation of the school district.  The fourth criterion for the seven part "just cause" test is whether the alleged misconduct was thoroughly investigated.  The fifth criteria for "just cause" is has the district applied its rules fairly and evenly.  The sixth criterion of the "just cause" test is whether the punishment is related to the seriousness of the offense.   The seventh criterion is whether there is progressive discipline, have mitigating circumstances been considered and will the penalty deter others from similar misconduct in the future.

**c.  Bias Corruption, and Further Evidence of Lack of Due Process**

.     The bias of H.O. Lawson's findings are that he disregarded all the criteria for just cause but the first. The second is that he prejudicially interrupted the cross-examination of Resnick just when he was beginning to admit that the adverse employment actions taken by Taveras against Saunders were predetermined and driven entirely by Resnick's animus to Saunders on racial, ageist, and retaliatory impermissible and unlawful grounds(¶95).

**POINT V**

**SAUNDERS DETERMINATION FROM THE DHR IS NOT PRECLUSIVE TO HER CLAIMS UNDER NY E.L. § 296**

The DHR determination of "no probable cause" had no preclusive effect, when the charging party is not represented by counsel during that proceeding.  Therefore, the §296 charges can be

22

brought either in their own right or as §1983 claims to bypass any limitations of Ed. L. § 3813 is not overcome by the civil rights and public interest exceptions to §3813 (*cf.* discussion in Memorandum of Law in Opposition to Motion to Dismiss ).   *See* Kosakow v. New Rochelle Radiology Assocs.*,* 274 F.3d 706, 734-36 (2d Cir.2001).   The public interest and civil rights exceptions to §296 permit the individual claims to be brought under this statute against individual aiding and abetting the discrimination, which includes Taveras, Resnick, Rivera, Antinez and Dennis.

## <u>CONCLUSION</u>

It is respectfully requested that plaintiff's cross-motion for judgment as a matter of law be granted for the nullification of the §3020-a in its entirety, and all concomitants arising from it as it was conducted without jurisdiction because none of the condition precedents spelled out in this and in the accompanying memorandum of law were met, it was not conducted at a reasonable time and in a reasonable manner.  Its sequella include but are not limited to the loss of teaching license which should be restored, the back pay for the suspension, the docked time for the partial constructive termination in the "rubber room," extraordinary damages for confinement to the rubber room caused by the unlawful adoption of the "rotational" or permanent panel which was not allowed by law at the time Saunders charges were brought against her, back pay and front pay and all lost benefits that emanate from the unlawful conduct of the §3020-a.  In addition, Saunders requests summary judgment be denied in its entirety to the defendants and granted to her to the broadest extent possible, to include all her statutory claims under federal, state and city law cumulatively, for additional extraordinary damages against the employer, the policy making individuals Taveras and Rivera (Rivera and Klein to be added when leave to amend the complaint under FRCP 15 a, b, or c is granted to conform to the facts).  Plaintiff also requests reasonable attorneys fees and reinstatement to her position at a suitable school offering course in her area of expertise and away from Rivera, Taveras and Resnick.

Dated: New York, New York
       May 14, 2010

                                    Respectfully submitted,
                                    JOY HOCHSTADT, P.C.
                                    300 Central Park West, Ste 2E
                                    New York, New York 10024

                                          /s/
                                  _____

                                    By: Joy Hochstadt (0935JH)
                                    Attorney for Plaintiff, Jennifer Saunders

24